Good morning, Your Honor. I believe I'll be going first on behalf of Apelli Portugal. Which is Cahill? Cahill? Cole Cahill, yes. Alright, sounds good. And then, are you planning to divide up the argument based on... Are you representing different parties? Yes, Your Honor. Who is First Counsel going to be representing? I represent Nurse Portugal. Okay. Good morning, Your Honor. I represent Dr. Saukhla. Okay, alright. That's helpful. Alright, and then, so as you've seen for Appellant's Counsel... First of all, I will say this out first too, but thank you very much for appearing, pro bono. Students always do a great job, in my experience. But you'll be starting, and if you can let us know how much time you plan to reserve for... Nobody's been successful yet, but you'll be the first one, I'm sure. Thank you. Alright, and you have, I think, 15 minutes on your clock. Take it away. Good morning, Your Honors, and may it please the Court. My name is Arijat, and I represent Appellant Ms. Felicia Thompson. At this time, I'd like to reserve three minutes for rebuttal. As the Court is aware from the briefing, this is a prison medical case. Plaintiff's father spent over six hours in the medical unit, where both defendants provided him some care. There's no dispute in that. Plaintiff's fundamental argument is that the minimal amount of care that was provided by the defendants was medically unacceptable because both defendants disregarded Mr. Thompson's numerous alarming symptoms. Plaintiff contends that the defendants' failure to appropriately respond to Mr. Thompson's noticeably worsening conditions resulted in a delay of appropriate medical care that would have otherwise saved Mr. Thompson's life. We argue that the District Court erred in granting summary judgment for three main reasons. First, the District Court improperly applied the summary judgment standard by failing to view the evidence in light most favorable to Mr. Thompson. Second, the District Court erroneously found that Mr. Thompson's right to be free from medically unacceptable care by Nurse Portugal was not clearly established in 2017. And third, the District Court erroneously found that Mr. Thompson's right to be free of medically unacceptable care by Dr. Sokla was not clearly established in 2017. To my first point, a court deciding summary judgment on the second prong of qualified immunity is required to adhere to the proper summary judgment standard. Here, the District Court erred in granting summary judgment because it failed to view the light most favorable to Mr. Thompson. We argue that the District Court, um, it, the District Court here, the District Court viewed issues of material fact, um, it disregarded material evidence and failed to view the evidence in light most favorable to Mr. Thompson. So what evidence, maybe this is about what you're telling me, what is the evidence that's most favorable, uh, to Mr. Thompson or to the survivor of Mr. Thompson who's bringing the lawsuit? So the most favorable evidence that the District Court disregarded were the numerous inmate testimonies. There's 12 of them. And there's five sworn depositions as well. And in those testimonies, there's instances where there's inmate witness, inmates, um, describing Mr. Thompson's mental status that day. They're describing him wanting to take a hot shower on a day where it was 115 degrees, where his speech is slurred, where once, once he's in the medical unit, he asks for more water. He's physically unable to eat or drink water. So, so of those, you know, if I remember right, some were his, his, uh, the inmates that were in, with him in the prison. Mm-hmm. And they're, and then I believe one or two were the inmates that were in the medical unit with him. The ones that were in the prison, let's start with, let's start with those. It's a little harder to say, uh, do we know, I should ask, do we know that, we have to assume that what they, that what they're saying is true at this date, but do we, do we know that, that either the nurse or the doctor knew any of that? In other words, like, that all could be true, but if that's not communicated to the nurse or the doctor, it's just not really, uh, something that, that would be for them. So they couldn't have been, um, they couldn't have acted improperly and not taking it into account. That was the one thing when I read their testimony. Yeah. How do they know that? So, um, so, so there's all these people in this prison explaining, describing Mr. Thompson's troubling mental status throughout the whole day. This is about, throughout six, seven, seven hours. This also draws the inference that his altered mental status is obvious. There's all these people around him and that he's obviously displaying this altered mental status. So that draws the inference that it should have been clear to, to Nurse Portugal. That said, Nurse Portugal responded to the man down call. She was there in the cell helping him put Mr. Thompson on the gurney and taking him to the medical unit. Several of these inmate witness testimonies are describing moments right before his man down call and during his man down call. So once again, if all of these people in his cell, his bunkmates, people across the cell, all around there are seeing this, it's presumable that Nurse Portugal also would have saw this as well. That is to say you're saying that Ms. Portugal is not fully describing or accurately describing what was in front of her? That is to say that she should have known, probably did know the condition that the inmates are reporting. Yeah, so we're saying that she's consciously disregarding his altered mental status. And the inmate testimony is not the only instance where that's the case as well. There's other instances where she's performing the GCS evaluation and she's asking him several questions and he's not responding to those questions. She marks he's unresponsive. So she's acknowledging that he's not responsive. And as Dr. Field, our expert, opined is that when an inmate is not responding, when a patient is not responding to those questions, then that's just proof that they're displaying an altered mental status. The altered mental status, though, is just one piece of the puzzle, right? So Nurse Portugal should have taken that altered mental status plus the troubling vitals he was displaying and done more with it, considered more with it because, Your Honor, these vitals, they meet SIRS criteria. And I'm not sure if you fully came across it in the briefing, but SIRS plus an infection is sepsis. So at no point are we saying Nurse Portugal should have known, that Nurse Portugal or Dr. Sokla should have known that at that time he was suffering from sepsis. We're saying this altered mental status plus meeting SIRS criteria, that should have been enough for them to draw laps, to do more, to do just a little bit more than just continue giving them water, to just doing the basics. And is part of the case that you're arguing that here we are on an extremely hot day and his body temperature is 96.5. So instead of having heat stroke, that is to say elevated temperature because of the temperature surrounding, there's something other than heat exhaustion or heat stroke or influence because of the heat surrounding him. Is that part of the argument? Absolutely. He's displaying below the normal temperature. And Nurse Portugal acknowledges this. Someone who's being treated with heat exhaustion should be displaying a higher than normal temperature in the hundreds. So that's just further proof that they're not really considering what they're doing. That is almost the proof. The other stuff, the altered mental state, I believe, would be consistent with heat exhaustion. But the big issue is this temperature thing. So can I take you to probably before we run out of time, can I take you to what I think is probably the hardest part of your case, which is the qualified immunity. I don't know what my colleague is saying, but it might be helpful for me to have you jump to that because that's always the hardest part for somebody in your position. And here, as I recall, you cited a 30-year-old per curiam case was sort of your main case from the Ninth Circuit, but it was before the estate of Ford, which there's some evidence that our circuit sort of changed the standard of how it applied qualified immunity in the estate of Ford based on the Supreme Court's saucer decision. So it's a little bit, I think you're doing a great job of what you have, but it's a little bit tough, the argument you've got. You've got a 30-year-old case, per curiam case. I think you had a couple out of circuit, and one unpublished opinion was sort of your clearly established law that they were violating. So what's your strongest arguments for why qualified immunity should go down? Before I start answering your question, something you said earlier, I believe I have 15 minutes, correct? Yeah, and right now you have seven minutes left, but three minutes of that we're trying to reserve for a bottle. Thank you. So in regards to the clearly established law, it's easier to break that down for Dr. Sokla and Nurse Portugal. So for Nurse Portugal, in our reply, we've actually provided for another case, Russell v. Lumetop. That case was decided this year, 2022, and it's describing an inmate's right to escalation of care, and it ultimately held that that right was clearly established in 2016. But how would, let's suppose that Nurse Portugal was presented with this case and read the case the morning of this, how would that have told her what to do? So the case is saying that the law was clearly established in 2016. So the doctors and the law of what, though? That Mr. Thompson had the right to be free from unacceptable medical care. Sure, but that's boilerplate stuff. But we've still got to figure out how to get to the difference between an Eighth Amendment violation and simple medical malpractice. Yeah. So in that case, the court held that the law was clearly established then. So they're pretty much describing that a case doesn't need to be on point. In this case, they're describing the actual medical case doesn't need to be on point. The nurse there, and I'll split it down specifically. There's three nurses there and one doctor. This first nurse there came across this inmate, and he was displaying life-threatening symptoms, nausea, anxiety attack. To the layperson, that doesn't seem extremely life-threatening. But the court held that the law was clearly established, that at that time a nurse should have known that when you're coming across a patient who is displaying worsening conditions, they should act, and they should act immediately in this emergency setting. What should they do differently from continuing to monitor their vital signs, providing them with fluids, and calling the doctor three times? Yeah, so here, as I said, in our case specifically, it's far more than just providing water and food. When you have a nurse, when a reasonable medical professional would receive this information, the altered mental status and the vitals, once again, those are key. When you meet SIRS criteria, there's four of them, elevated respiratory rate, the body temperature, blood pressure, and a white blood count. Those are four easy things to determine, three of which are easy to determine right there and then, blood pressure, temperature, and respiratory rate. Blood pressure, temperature, and the respiratory rate. Just to take you to it because we're getting close. Sorry. No, no, no. But this is the experience of arguing, is you kind of get pushed all over. But we are trying to get at what we think. Yeah. So in Russell, you've got a doctor who gave somebody a Motrin for a heart attack, right? So that's the whole challenge with qualified immunity is it certainly can't be at the highest level of generality. You've got to give them quick care when they need quick care. That can't be the clearly established law. I hope you'd admit to that. But giving a Motrin and a menthol screening for a heart attack is different than this. It's obviously a different circumstance. So how did that put these people on notice at the level of specificity we need? So it's responding accurately to a worsening condition. But how is that different from medical malpractice? So it's different because Nurse Portugal was displaying a conscious disregard to these actual alarming symptoms. What conscious disregard? If she had called the doctor and the doctor says it sounds like heat exhaustion, then where's the conscious disregard? Well, she's not properly displaying and she's not properly explaining the altered mental status. She gave him a perfect score. But she reported that he was responsive to certain questions. He was unresponsive. She reported that he was responsive to some of her questions and that he was unresponsive in other ways that she took as sort of a deliberate silence on his part. That may be a misperception. But where's the evidence that she deliberately ignored? In other words, that she was acting contrary to what she in fact knew. Well, she was – she – well, Your Honor. It doesn't feel like that when she's monitoring him very regularly and calls the doctor three times in the course of a couple of hours to say, here's what I'm seeing. Go ahead. She's actually not even following CDCR protocol. CDCR protocol for heat exhaustion requires her to take vitals every five minutes and to do a lot more than what she did, take off his clothes, actually perform a valid GCR evaluation. She's not doing the basics. And the inmate testimony says that she didn't even give him water, enough water. Like she mentioned that she gave him water. She told the doctor that she gave him water. But there's inmates there saying that there were times where he needed to – they needed to go and give him water. These were inmates who were actually assisting in the medical unit and provided him with water. I mean, if she's seen them give him water, that feels like she doesn't have to come and bring him a different glass. It was a janitor. It wasn't some – it wasn't a nurse or anything. The janitor did that. Okay. So – I guess the difficulty – and then we'll give you time for rebuttal. So it's like bonus. You're on bonus time right now. Thank you so much. The difficulty is, you know, I mean, think of – we have to draw a line between conscious disregard and medical malpractice. It's a black ladder that medical malpractice is not sufficient. And the difficulty is, you know, when you look at some of these cases that have conscious disregard, they're the kind of thing you would – like you'd give as a hypothetical in law school, right? Like somebody's on a gurney and they're just laying there for 40 minutes and you're not giving them – you're consciously disregarding. I think what Judge Bybee's getting at is the general – it may feel like the nurse is doing it all wrong, and that's what we kind of think of as medical malpractice. It's the same sort of – but it's hard to see where she's consciously disregarding. She did do a lot. You're saying, but she did it all wrong. But she did do a lot. So where's the conscious disregard? How does this fall in that line? But more importantly, with qualified immunity, how does it fall so clearly on that side of the line that we can rule for your client? So we're actually saying she didn't do that much. She gave him water and food, and she took his vitals. She called the doctor. I mean, if she's really consciously disregarding, you think she's just going through the motions and calling the doctor, I guess? This analysis requires a doctor's – as I'm sure you're aware, you've seen a lot of these cases, it requires a subjective analysis from the nurse and the doctor. And as I said, when you see these symptoms, the one point I didn't make at the end was that a lab needs to be drawn right there and then to see if his white blood count is elevated. They haven't ruled out an infection. And when you see these symptoms, the immediate thing you need to do is draw a lab. And more things she didn't do is they said he was suffering from dehydration. Never ran a test. Never did a dipstick test. Could have even had him pee in a cup and check the color. Didn't – I thought that Dr. Field testified that once he got to the hospital where he passed away that he was not dehydrated. He wasn't. So they were treating – they didn't even check if he was dehydrated. No one ever said he was dehydrated. He never said he was suffering from dehydration. And he never said he was suffering from heat exhaustion. She just assumed he was because it was 115 degrees out there. That's the problem. This guy comes in, 115 degrees, and immediately he never said he was suffering from any of these symptoms. He's obviously displaying an altered mental status. And she sees all this and immediately goes, oh, must be suffering from heat exhaustion or dehydration. Let's start treating him for this. Well, I don't want to belabor this or take it too long, and maybe Nurse Portugal didn't hear this, but when he's confused, blurred speech, and asks to be taken to the shower, he says he's burning up. Now, that suggests that he actually is having a heat stroke or heat exhaustion, which apparently he's not because you look at the body temperature. But he's saying I'm burning up. Absolutely. He does say that. And he is asking for water from the janitor, right? Yeah. So, I mean, it's still 115 degrees, so you would assume you would want some water. But the vitals there as well are displaying his body shutting down. And this is the nurse's job. You see the blood pressure. It goes up, up, up, and then at the very end it crashes. And it hits 120 at the last vital. And then she goes, oh, he's fine. If she had taken another vital, and they did, when he was back in the cell ten minutes later, he had crashed to 90. He went from 100 to 20. His temperature was going up and down. But these are all really good arguments for medical malpractice. Difficult is just deliberate indifference as opposed to just a bad misdiagnosis. That's the challenge, I think. We'll have a few more questions for you on rebuttal if my colleagues don't. But great job, and we'll hear from counsel on the other side. Thank you so much. You may proceed. Good morning, Your Honors, and may it please the Court. As I said, my name is Nicole Cahill, and I represent Nurse Portugal in this case. I want to respond to a couple of points that my colleague raised in his opening. They repeatedly classified this as a worsening medical condition over time. Mr. Thompson's vital signs over the few hours he was in the TTA improved. That's the opposite of a worsening condition. His blood pressure stabilized to normal levels. His respiration stayed relatively the same. His pulse rate came down, and his oxygen saturation levels continued to be 100% on room air. He wasn't nonresponsive. I think that's a misnomer. Ms. Portugal clarified in her deposition that when she wrote that, what she in fact meant was she would ask a question, and he would respond, acknowledging that he heard her, but instead say, I just want my pain medication, or can you just let me sleep? That's not being unconscious or nonresponsive in the way that I think the appellant would have this Court believe. For those reasons, she believed that he was not suffering from an altered mental status. There's no indication that she was aware of the behaviors that the inmates noticed in the dorm, and so she concluded that his reaction was obstinance, that it was not somehow related to an altered mental status that he couldn't control. With respect to the body temperature, that was relayed to Dr. Sakhla with the rest of the information, and the case that appellant relies on now in reply I think is actually more favorable to Nurse Portugal because in that case, which again was a 2022 case, was not in existence at the time of the incident in this case and was also a 14th Amendment case, this Court clearly stated with respect to one of the nurses that there was no clearly established law that would have put a reasonable nurse in her position on notice that she violated the plaintiff's constitutional rights because she was following the recommendations of the doctor, and that's exactly what we have here. The Court in the Russell case did acknowledge that while she probably should have called paramedics based on what she knew, that she could not be construed as being deliberately indifferent because she was following the physician's recommendations and treatment plan. Now, Nurse Portugal didn't diagnose Mr. Thompson. That was the doctor's job. They didn't diagnose him with heat stroke. They looked at his vitals. Granted, the body temperature is a little off, but there's a lot of reasons why that could happen. Some people run slightly cool. Depending on how the temperature is taken, what kind of thermometer is being used, that could vary as well. And based on the weather of the day and having seen several other inmates that presented with dehydration symptoms, they saw horses, not zebras. They thought, well, he's probably dehydrated due to the heat. He's experiencing exhaustion because of the heat. Let's keep an eye on him. Take his vitals consistently. Call me back, is what Dr. Sokla said, which she did. And once his vitals stabilized, they decided he could return to his housing unit. And there is no clearly established law out there that existed at this time that would have put Nurse Portugal on notice that anything more was required from her under the circumstances that we were presented with in this case. The district court did not misconstrue facts against the appellant in this case. In fact, the district court acknowledged that even if you accepted that Mr. Thompson was displaying an altered mental status, that there was still no clearly established law that said that anything more was required, including calling for EMTs or for paramedics with the rest of his presenting symptoms. So with that, I've got a couple minutes left, but I would submit on that unless the panel has additional questions. I don't think so. I wanted to make sure. Sometimes when we have a split time like this, the first counsel will eat into the second, so it's nice of you to not do that to your colleague. And I apologize. I did notice that the appellant didn't really address much Dr. Sokla on that, so I'm not sure if there was going to be additional time for that. I don't think we need any more on that, so we'll go ahead and turn over to the doctor's counsel. May I please record Diana Esquivel from the Office of the Attorney General for the State of California on behalf of the appellees and defendants, Officer Briggs and Dr. Sokla. Qualifying immunity is proper in this case because there was no clearly established law that Dr. Sokla was required to elevate Mr. Thompson's level of care based on the symptoms with which he presented in the medical clinic in September 2017. Also, the law was not clear that – Do you think there was a mistake made here by the nurse or the doctor? I don't think so, Your Honor, but the mistake in terms of that could potentially be supported on this would be nothing more than malpractice, and Dr. Sokla did not move for summary judgment for negligence, and that was not decided by the district court. There was no mistake in terms of the district court finding that there was no law that would have made Dr. Sokla understand that had he not proceeded in a specific course of treatment that it would have been unconstitutional. The cases upon which Ms. Thompson relies on are all very factually distinguishable. Russell, Matheson, Milter all deal with cases where the detainee or the prisoner was suffering from symptoms that were commonly associated with a heart attack, such that it was either obvious or reasonably already understood at that time that the course of treatment that they chose was unacceptable. For example, in Russell, the detainee was complaining of chest pain and had done so for about 12 hours, and one of the nurses provided him with nitroglycerin, which did not dissipate any of his symptoms, but rather than referring the detainee out for higher care, given that his symptoms had not dissipated with the dose of nitroglycerin, they kept him in his cell and ignored the fact that his condition was worsening from just pain to vomiting, nausea, drowsiness, in and out of not necessarily complete consciousness, but just his awareness was starting to be affected to the point that by the time they finally did call the paramedics, for all intent and purposes, the detainee had died. Similarly, in Matheson, you have a prisoner complaining of left arm pain and chest pain, and the nurse, rather than going to the cell and evaluating and assessing the person, instead asked a lieutenant, a custodial staff member, to inquire as to what that person's complaints were. And then finally, when the inmate is sent to the infirmary, the first thing out of the nurse's mouth is, so you're the one complaining about having a heart attack, where the court there, even though it's out of circuit, mentioned that there was evidence that the nurse had drawn an inference that this inmate had in fact been suffering from a heart attack. Counsel, I'm curious sort of about the procedural posture of this case. So there was a malpractice claim filed under California state law. The district court dismissed the federal claims and then in an exercise of discretion declined to hear the state claims. Are those claims currently pending in state court? No, Your Honor. The appeal was taken. So my understanding is that the statute of limitations is told while we work out the appellable issue. So if we were to affirm in this case, the plaintiff still has a live state claim. Is that correct? That is correct, Your Honor. And this is just pure ignorance of California law, but I'm unashamed, so I'm going to express my ignorance. Is this treated in a prisoner case? Is it treated just as any ordinary case of malpractice, or are there special rules in California that would apply to a medical malpractice case arising in a prison context? No, Your Honor. The standard of care applies regardless of the status of the patient, prisoner, not prisoner, and where the treatment took place, whether in custody or out of custody. The standard of care for a medical malpractice is the same. I understand that the statute of limitations on the state law claims are told during the pendency of the federal case. Has there been a filing in state court of a complaint based on the state law claims? Not that I'm aware of, Your Honor. That's irrelevant to our decision. I'm just curious as to whether that's happening yet. Thank you, Your Honor. When we look at all the cases that are cited in the briefs, both in Ms. Thompson's brief and the doctor and the nurse's brief, all of the cases are factually distinguishable. I think what makes this case out of the realm of the cases that are cited is that unlike a heart attack, unlike an incorrect decision such as Lucio where the doctor pursued a course of treatment for heroin withdrawal and ultimately it turned out that the inmate had been suffering from alcohol withdrawal, is that, as the evidence showed in Lucio, is that the symptoms of psychosis and hallucinations were inconsistent with heroin withdrawals. Here, Dr. Field conceded at his deposition that Mr. Thompson's abnormal pulse readings, heart rate, temperature, was not solely caused from SIRS, systemic inflammatory response syndrome. He said it could have been attributed to dehydration. It could have been attributed to Mr. Thompson's back pain. It could have been attributed to possible sepsis. And he even conceded that it could also have been attributed to the manner in which the temperature was taken. So this is not a case where we have symptoms that point in one direction, such as chest pains, left arm pain, that we all recognize that we can even say that it's obvious of a heart attack. Rather, Mr. Thompson presented with symptoms that could have been indicative of many other conditions and it was not improper for Dr. Sakla to pursue one course based on the information available to him that it was a hot day. Other inmates throughout the day had complained of dehydration or exhaustion secondary to the heat. And Dr. Sakla pursued that and saw that Mr. Thompson's symptoms improved. So whether he erred in making a differential diagnosis of exhaustion secondary to the heat or dehydration is a difference of opinion to that of Dr. Field. And the court properly found that that difference of opinion is not a constitutional violation. And the law, there is no case law that remotely put Dr. Sakla on notice that a particular course of treatment was required under these circumstances. And unless the court has any questions, I will submit. I will just briefly state that Ms. Thompson did not address the claim granting qualified immunity to Officer Briggs in their brief. We saw that in the brief. So I see that your argument is that's waived. So unless there's any questions, Your Honor, I'll... No further questions. Thank you, counsel. And with that, the appellees have made their argument. You can come back up for... I will put two minutes on the clock for rebuttal. You may proceed. Thank you. So I think the major issue here in this case currently is that the district court went into this case not applying the proper summary judgment standard. And I think it made this clear when it was referred to the inmates, inmate testimonies and inmates in general as a bunch of fakers. And he minimized what an altered mental status is in the prison. And that's in the experts of record. And I think he does this continuously. He continues to do this. The district court continues to do this throughout his ruling. And the opposing counsel, I believe, does this too. They're not viewing any of the facts in light most favorable to plaintiff. And I want to run the list of, a quick list of, it is disputed whether Dr. Sockler's instructions were properly carried out by Nurse Portugal, whether she performed a proper GCS evaluation, whether she properly followed the CDCR protocol, whether she properly recognized Mr. Thompson's altered mental status. But, counsel, how do you get from that, from medical malpractice, assuming everything that you've, that you can prove everything you've just said, how do you get from medical malpractice to deliberate indifference? So the crux of the argument is that we're not denying that she provided some care. She did provide some care. And that seems to distinguish it from almost all of the cases that you've cited, where somebody is ignored for hours and hours and hours at a time, just lies on a gurney or in a bed someplace without being seen. Or given a Motrin for a heart attack, you know, so it's still tiny. Yeah, so that's actually, there are, so this was a period of six hours. Like, if I'm not mistaken, the qualified immunity was created to protect officials in a split-second decision. This is happening over six hours. She has the ability to think and see that maybe both the doctor and the nurse have the ability to think that maybe they're not doing the right thing. And that maybe these alarming symptoms, maybe there's a little bit of care that they're providing, they're not properly responding. The doctor's off-site, and he's called three times. He's called every two hours about this patient. Yeah, so that does actually come up in cases. In Dominguez, that comes up where, I'm sorry, that happens in the state of Holton. In the state of Holton, the doctor never refuses to talk to a patient. He prescribed some medication, but this court ruled that that wasn't enough. And there's a number of cases, I'm sorry I'm running out of time, but there's a number of cases where the medical officials are providing some care, but that care, the court continuously rules that that care is not enough when there is an emergency situation, when a patient is obviously displaying symptoms. And unfortunately, it seems as if the symptoms of sepsis are being downplayed, as if they're not as serious of a heart attack. But in fact, 50% of patients who go to the ICU who are not treated in time die. Not to mention, this inmate, Mr. Thompson, had HIV, which increases the chances of him dying. And Nurse Portugal and Dr. Zocla knew that. Do you agree with the state's counsel that you still have a remedy in state court? I believe so, but we're in this court currently. I understand, counsel, we're in this court. Do you still have a state remedy for the malpractice claims? I've got to talk to my supervisor there, because I've still got some more courses in law school. But yes, I would assume so. Okay. Okay, well, counsel, you've done a great job. Thank you to both sides that have provided a helpful argument. And I just want to, again, give the court's thanks to the program. I think this one is at Davis, and that always provides these helpful and he's always very well-prepared law students. Thank you very much. So we will move on to our last case of the day.
judges: FLETCHER, BYBEE, VANDYKE